## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-55 (LLA)** |
| **v.** | : | |
| | : | |
| **DEAN HARSHMAN,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Dean Harshman to 3 months' incarceration (the middle of the applicable Guidelines range) and 12 months of supervised release. The government also requests that this Court impose, consistent with the plea agreement in this case, $500 in restitution, along with the mandatory assessment of $25.

### I.    Introduction

Defendant Dean Harshman participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Harshman pled guilty to one count of disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). The government's recommendation is supported by Harshman's blatant disregard for the illegality of his actions, open defiance of police on the West Plaza, and decision to enter the Capitol building and a first floor Senate office. As a member of the first wave of rioters to breach both the Capitol grounds and the Capitol building, Harshman joined rioters focused on disrupting the certification proceeding and the peaceful transfer of power.

 The Court must also consider that Harshman's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Harshman's crime support a sentence of 3 months' incarceration.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 31 ¶¶ 1–7.

### *Harshman's Role in the January 6, 2021 Attack on the Capitol*

Harshman traveled from his home in Ohio to attend the "Stop the Steal" rally in Washington, D.C. on January 6, 2021. That day, Harshman wore a light gray Cabela's sweatshirt with dark gray sleeves, a green backpack, and blue jeans. *See* Image 1.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.



*Image 1*
(Harshman indicated in red box)

Harshman recorded videos on his cell phone throughout the day. Those videos—filmed from Harshman's point-of-view—depicted individuals at the rally discussing traveling to the Capitol to disrupt the certification. In one such video, an individual with a megaphone near Harshman shouted, "Directly after Trump's speech, we will be going to the Capitol. We will be going *inside* the Capitol building." Exhibit 1 (video).[2] Harshman subsequently filmed a series of videos as he marched with a large crowd of rioters toward the Capitol. In one video, Harshman proclaimed, "This is a historic march to the Capitol." Exhibit 2. In another, Harshman turned the camera toward himself and said, "Here we are, on the march to the Capitol. Taking down the House, baby!" Exhibit 3.

As the crowd approached the Capitol grounds and began to grow increasingly unruly, Harshman remarked, "There's all kinds of DC police officers standing guard in front of our House." Exhibit 4. As he acknowledged the police presence, Harshman filmed the physical

---

[2] The government's video exhibits will be provided separately to the Court and counsel.

elements of the Capitol's restricted perimeter: bike rack barriers, snow fencing, and "Area Closed"

signs. *See* Image 2; Exhibit 4.



*Image 2*
(depicting Harshman's perspective—police indicated with
yellow arrows, signs/fencing indicated by red arrows)

Shortly after approximately 12:50 p.m., rioters broke down security barriers at the Peace

Circle and Pennsylvania Avenue walkway. Harshman continued filming in those locations as he

joined the first wave of rioters to breach into Capitol grounds. As rioters ahead of him tore down

additional barriers and engaged police officers, Harshman shouted, "This is the stuff they ain't

going to show you on TV!" and, "We're taking our House back!" Exhibit 5. At one point,

Harshman panned his phone camera down to focus on an "Area Closed" sign that had been ripped

to the ground by another rioter. As he filmed the sign, Harshman shouted, "Area is NOT closed!" and stepped on the sign. Image 3; Exhibit 6.



*Image 3*
(depicting Harshman's perspective and foot on the sign)

Harshman marched forward to the northern portion of the Capitol's West Plaza, in front of the inaugural stage. Harshman remained in this location—at points only about 10 feet from the police line holding the rioters back—for almost two hours. During that time, Harshman spoke with other rioters about the police's attempts to resist the crowd's progress toward the building. At one point a rioter near Harshman shouted, "Push them slowly!" in response to which Harshman commented on the presence of police with crowd control munitions above them on the Inaugural Stage. Exhibit 7. At another point, Harshman zoomed his camera in on the police stationed on the stage equipped with riot shields, pepper ball guns, and other crowd control munitions. One nearby stated, "We need to get in there." Image 4; Exhibit 8.



*Image 4*
(depicting Harshman's perspective)

Harshman continued to remain on the West Plaza and film videos even as the police employed concerted efforts to disperse the crowd. In one video, Harshman shouted, "They just threw a flashbang at us!" and commented, "I'm not leavin'." Exhibit 9.  In a subsequent video, a rioter near Harshman can be heard stating, "I don't care about going to jail, dude. Alright? 'Cause this is fucking war, motherfucker." Exhibit 10. In another video, Harshman's phone captured the crowd chanting, "Stand down! Stand down!" at the police. Exhibit 11.

Harshman continued to remain on the West Plaza, even—as his own videos show—police stepped up their efforts to disperse the crowd. For example, one of Harshman's videos shows police officers about twenty feet ahead of him deploying chemical spray into the crowd. *Image 4*; Exhibit 12. In another video, Harshman filmed as a crowd control munition was hurled in his direction and detonated next to him. Exhibit 13. After the munition detonated, Harshman recovered and shouted, "It was just a flashbang." *Id.* Meanwhile additional munitions detonated within the crowd around Harshman, and he shouted, "Gas, gas, gas!" *Id.* In response to the police's efforts, Harshman and the rest of the mob did not leave. Indeed, they only grew more agitated. At one

point, Harshman said, "We stand here, they get tired." *Id.* As police efforts to control the mob to Harshman's left began to falter, Harshman shouted to his fellow rioters, "Here we go, left side, left side!" Exhibit 13. Meanwhile, even more crowd control munitions detonated near Harshman, which he ignored. *Id.* As some rioters turned around and left the Plaza in response to the munitions, gas, and chemical sprays, Harshman stayed put near the Northwest Stairs. *Id.*

Eventually, the police lines on the Northwest Stairs broke, and Harshman continued filming as he joined a flood of rioters rushing up the stairs to the Northwest Courtyard on the Upper West Terrace. Image 5; Exhibit 14.



*Image 5*
(depicting Harshman's perspective)

Harshman remained on the Northwest Courtyard until rioters breached the nearby Senate Wing Door at approximately 2:12 p.m. and entered the Capitol building. Harshman entered the building approximately eight minutes later, at approximately 2:20 p.m. Exhibit 15. As Harshman

entered the Senate Wing Door, his phone captured video of the shattered glass on the Senate Wing

Door, as well as audio of a blaring security alarm and a rioter shouting, "Pelosi, where are you?

Bitch?" *Id.*; Images 6 (screenshot Exhibit 15) and 7 (from Capitol CCV).



*Image 6*
(depicting Harshman's perspective—broken glass visible on the left)



*Image 7*
(Capitol CCV—Harshman, indicated with red box, holding up his phone to record video)

Still filming, Harshman began walking to the Capitol Crypt. Exhibit 15. As he neared the

Crypt, Harshman cautioned other rioters against destroying Capitol property. *Id.* But while in the

Crypt, Harshman walked up to a small group of U.S. Capitol Police officers and told them, "This

is the revolution. This is it. This is the chase." *Id.* A nearby rioter then asked, "Where are the traitors?" *Id.*

Several minutes thereafter, Harshman departed the Crypt and entered a nearby Senate office, which had been evacuated prior to the breach. Image 8; Exhibit 16.



*Image 8*
(depicting Harshman's perspective)

As Harshman filmed the office, a U.S. Capitol police officer, clad in heavy riot gear, confronted Harshman and the other rioters in the office. Harshman agreed to leave and made his way back to the Senate Wing Door, where he queued with other rioters to exit through a broken window. Harshman left the Capitol building at approximately 2:35 p.m., having spent about 15 minutes inside. Harshman remained on restricted grounds for some time thereafter; he filmed additional videos on the Upper West Terrace, the Northwest Stairs, and West Lawn. *See, e.g.*, Images 9 and 10.



*Image 9*
(depicting Harshman's perspective)



*Image 10*
(depicting Harshman's perspective)

Following the events of January 6, 2021, Harshman saved images of social media posts to

his iCloud account concerning the riot and the Electoral Certification. In the evening of January 6,

2021, Harshman saved a screenshot of a post alleging "congress is on capital hill committing treason[.]" Image 11.



*Image 11*

On January 7, 2021, Harshman saved screenshots of a Twitter post claiming "A very special place in Hell awaits Pence" and of an article entitled "Trump Supporters Storm U.S. Capitol, Clash With Police[.]" Images 12 and 13.



*Image 12*



*Image 13*

*The Charges and Plea Agreement*

On January 31, 2024, Harshman was charged in a five-count Indictment with violating 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On September 16, 2024, pursuant to a plea agreement, Harshman pled guilty to Count Three of the Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(2). By plea agreement, Harshman agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Harshman now faces a sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Harshman faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year. Harshman must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078–79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines

### A.  Guidelines Calculations

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

As set forth in the PSR, the U.S. Probation Office calculates Harshman's Guidelines as follows:

Count Three – 18 U.S.C § 1752(a)(2)

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4) | +10 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Zero-Point Offender (U.S.S.G. § 4C1.1) | <u>-2</u> |
| **Total Adjusted Offense Level** | 6 |

*See* PSR ¶¶ 34–43.

### B. Zero-Point Offender Adjustment

The U.S. Probation Office calculated Harshman's criminal history as a category I, which the government does not dispute. PSR ¶ 46. Accordingly, the U.S. Probation Office calculated Harshman's total adjusted offense level at 6, and his corresponding Guidelines range at 0–6 months. PSR at ¶ 114.

The government agrees with the U.S. Probation Office's calculations. But while the government concedes that §4C1.1 applies to Harshman, the government nevertheless believes the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters

14

contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, Harshman's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

### C.  Other Guidelines Considerations

However, Harshman's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes—namely, his intent to stop the certification regardless of the unlawful means it would take for him to do so—which struck at the heart of our democracy and the rule of law. While the government is not advocating for a variance or departure, a sentence of

imprisonment is not only reasonable, but fully balances Harshman's conduct and the circumstances in which he committed said conduct. One cannot divorce the gravity of the overall threat to democracy from Harshman's behavior.

Indeed, as it stands now, nothing in this defendant's Guidelines calculation reflects the fact that he was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next.[3] There are no specific offense characteristics here for attacking democracy or abandoning the rule of law. Thus, a sentence of 3 months' incarceration more than adequately "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must

---

[3] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21 and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of

government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

To be clear, the fact that the government is not seeking a variance or departure does not diminish the gravity of our request and the need to appropriately account for the conduct and the crime.

V.    **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence that includes a period of incarceration.

A.    **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While Harshman's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a defendant like Harshman, the absence of violent or destructive acts is not a mitigating factor. Had Harshman engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Harshman's case is the clear evidence of his conscious disregard for the law, efforts of police, and sanctity of the certification process. Harshman's videos showcase several key events that reveal Harshman's corrupt intent that day. First, Harshman filmed an "Area Closed Sign" and stepped on it, shouting, "Area is NOT closed!" Such a simple act reveals much: that Harshman understood the Capitol's restrictions; that Harshman believed his mission was beyond those restrictions; and that Harshman soberly comprehended that his conduct was in complete defiance of the law.  Second, Harshman's videos show he was subjected to multiple sting bomb and/or flashbang deployments, chemical spray, and other crowd control tactics on the West Plaza, yet chose to remain on Capitol grounds and enter the building.

Throughout his time on the West Plaza, Harshman considered and evaluated the police's efforts, and his only response was to exclaim, "I'm not leavin'." Exhibit 9. And third, Harshman's videos confirm he joined the first waves of rioters to breach the Capitol grounds at the Peace Circle and the Capitol building at the Senate Wing Door. Despite his hours of opportunity at various stages of the day's events to reflect on the impact of his unlawful conduct, Harshman consistently chose to be one of the first to breach new ground and defy the law further and earlier than others in the mob.

Additionally, Harshman counts among those defendants who spent time in sensitive places within the Capitol. A defendant's entry into a sensitive space, such as a Senate office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Crypt. A defendant who entered a sensitive space took an extra step to occupy the Capitol, displace Congress, and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway. After leaving the Crypt, Harshman entered a room clearly recognizable as a private office and only left once accosted by an armored police officer.

Ultimately, Harshman's premeditated intent to break into the Capitol and interfere with the peaceful transfer of power, as well as his brazen perseverance in pursuit of that goal despite obvious police presence and crowd dispersal methods, establish the clear need for a sentence of incarceration in this matter.

### B. Harshman's History and Characteristics

Harshman is a 37-year-old gunsmith and farmer. He has a history of employment with the military, including approximately four years as a marine, several years as a law enforcement officer for the Air Force, and approximately 8 years as a civilian employee for the Airforce Institute of Technology. He also spent approximately 1.5 years as a senior security advisor for Booz Allen Hamilton. He holds three associate degrees and a professional welding certification.

In all, the PSR shows Harshman has a strong employment history, stable finances, a good education, and a supportive family. All of these factors would ordinarily support an argument that Harshman poses a lower risk of recidivism. However, they also demonstrate that Harshman had every advantage and choice available to him on January 6, 2021. His crimes were not motivated by poverty, abuse, or addiction. Instead, Harshman committed a very serious crime—rioting at the U.S. Capitol—because his preferred candidate did not win the election.

Harshman's strong employment history in military, law enforcement, and security roles also shines a revealing light on Harshman's defiance of police and lawful restrictions at the Capitol that day. Many of Harshman's videos on the West Plaza focus on the police's equipment and tactics. Harshman is able to note or anticipate many of the efforts police made to try and drive back the crowd. As such, it is apparent that Harshman chose to harness his experience to further his criminal conduct that day, rather than draw on his experience to recognize the impact of his unlawful actions. His voluntary and conscious decision to storm a guarded government building is all the more disturbing in light of his service.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate

yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

    *Specific Deterrence*

    The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

    As discussed, Harshman's significant experience in military, law enforcement, and security did not prevent him from storming the Capitol on January 6, 2021. There are very few backgrounds that would better prepare someone to reject the choice to engage in criminal conduct in the situation Harshman faced, yet he chose to break the law anyway. Additionally, Harshman has not taken any steps to denounce his actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. The Court should thus view any remorse Harshman expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

    **E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[4] This Court must sentence Harshman based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Harshman has pled guilty to Count Three of the Indictment, charging him with Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Matthew Baggott*, No. 21-cr-411 (APM), the defendant pled guilty to violating 18 U.S.C. § 1752(a)(2). Like Harshman, Baggott amply witnessed the police's desperate efforts to control rioters on the Capitol's West Plaza. Both Harshman and Baggott entered the Capitol through the Senate Wing Door following its initial breach, but Harshman was also among the first wave of rioters to breach the restricted perimeter at the Peace Circle. Unlike Harshman, Baggott interfered with officers: he threw an object at a group of officers and grabbed at a police baton. But unlike Harshman, Baggott did not evince a sophisticated and corrupt intent to stop the certification proceeding. Judge Mehta sentenced Baggott to 3 months' incarceration, and the Court should do the same here.

In *United States v. Mark Sahady*, 21-cr-134 (CJN), the government moved to dismiss the § 1512(c)(2) charge from the Indictment in that case prior to trial. The defendant was subsequently found guilty following a bench trial of violating the same four misdemeanors with which Harshman is charged—with § 1752(a)(2) being the leading charge. Like Harshman, Sahady evinced clear knowledge that entering the U.S. Capitol grounds and building was unlawful, yet deliberately chose to violate restrictions in order to disrupt Congress anyway. Whereas Sahady's corrupt intent was plain from communications he made prior to January 6, 2021, Harshman's corrupt intent was recorded contemporaneously with his criminal conduct—leaving no question that he appreciated the full gravity of his criminal conduct at the time he made his decision to break

the law. Judge Nichols sentenced Sahady to 5 months' incarceration and a $2,000 fine. A lower sentence is warranted for Harshman, given that Sahady—unlike Harshman—did not accept responsibility via a plea and was found to have obstructed justice by destroying evidence.

In *United States v. John Livingston*, 24-cr-6 (DLF), the defendant, who, like Harshman, was charged with violating § 1512(c)(2), pled guilty to violations of both § 1752(a)(1) and (2). Livingston expressed his anticipations prior to January 6, 2021, that demonstrations in D.C. could get out of hand. Like Harshman, Livingston spent a period of time on the West Plaza and witnessed the first clashes with police and the police's use of crowd control munitions. Harshman and Livingston ascended the Northwest Stairs and entered the Senate Wing Door at approximately the same time, and both defendants filmed video on their phones to document their progress. Harshman and Livingston also left the Capitol building through the same broken window within about a minute of each other. Judge Friedrich sentenced Livingston to 70 days of intermittent confinement[5] as a condition of 36 months' probation. A slightly longer term of incarceration is warranted for Harshman given his presence at the initial breach of the restricted perimeter at the Peace Circle and entry into a Senate office.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

---

[5] Though the government is not seeking such a sentence for Harshman, as a condition of probation, a court may order that the defendant be incarcerated "during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(1); *see also United States v. Little*, 78 F.4th 453, 461 n.7 (D.C. Cir. 2023) (section 3563(b)(1) "contemplates short periods of confinement like 'nights' and 'weekends' interspersed throughout probation"). The statute was designed to give courts flexibility in the "fashioning of conditions of probation in order to make probation a useful alternative to a term of imprisonment." S. Rep. No. 98-225, at 59 (1983).

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Harshman must pay $500 in restitution, which reflects in part the role Harshman played in the riot on January 6.[7] ECF No. 30 ¶ 15. As the Plea Agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Harshman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VII.    Fine

The defendant's conviction for a violation of  18 U.S.C.  § 1752(a)(2). subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Harshman to 3 months' incarceration

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

(the middle of the applicable Guidelines range), 12 months of supervised release, $500 in restitution, and the mandatory special assessment of $25. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Harshman's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759